**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**ASHLAND**

| | |
|---|---|
| **STEPHANIE DENISE LEWIS, et al.,** | **CIVIL ACTION NO. 0:20-CV-113-KKC** |
| **Plaintiffs,** | |
| **v.** | **OPINION & ORDER** |
| **BRIAN TACKETT, et al.,** | |
| **Defendants.** | |

*** *** ***

This matter is before the Court on the defendants' motions for summary judgment. (DEs 67 & 68). For the following reasons, the motions will be GRANTED.

**I.      Facts & Background**

In this action, Stephanie Lewis, Jennifer Lewis, and minor plaintiff H.S. bring claims under 42 U.S.C. § 1983 against Brian Tackett, Chris Castle, Zak Clark, and Michelle Light in their individual and official capacities. Plaintiffs allege unreasonable search and seizure, false imprisonment, and substantive due process, procedural due process, and equal protection violations.

Plaintiffs Stephanie and Jennifer Lewis are a married same-sex couple who resided in Greenup County, Kentucky.  H.S. is their minor child. Stephanie Lewis is H.S.'s biological mother, and Jennifer Lewis is his stepmother. At the time of the alleged events giving rise to this litigation, H.S. was in second grade at Russell Primary School.  Defendants Brian Tackett, Chris Castle, and Zak Clark were all officers with the Flatwoods Police Department, and also served as School Resource Officers for the Russell School District. Defendant Michelle Light was employed as a

1

counselor at the Russell Primary School. The facts of this case are somewhat complex, but the plaintiffs' claims all relate to a series of encounters that occurred on September 4 and 5, 2019.

### A.     The initial truancy investigations

On September 4, 2019, an attendance clerk at Russell High School notified Russell Schools Director of Pupil Personnel David Trimble that a 16-year-old male student was absent. (DE 66 at 15-16). Trimble went to the student's home and spoke with his mother, who stated that she was unaware of her son's absence. Trimble notified Officers Tackett and Clark. (*Id.* at 16). Shortly after they began investigating the student's whereabouts, the absent student's mother contacted Trimble and reported that her son was at the Lewis residence refusing to go to school. (*Id.* at 18). Trimble, Tackett, and Clark then went to the Lewis residence.

According to all involved, Trimble, Tackett, and Clark spoke with the Lewises outside their home. Stephanie Lewis stated that the truant boy, A.J., arrived at her home some time on the morning of September 4. (DE 60 at 62-63). A.J. was friends with two of the three Lewis foster children. (*Id.*) Lewis reported that earlier in the day, A.J.'s mother and her boyfriend had come to the Lewis residence in search of her son. After A.J. refused to go to school, his mother left.  When Trimble and other officers arrived, A.J. was at the Lewis residence.  Stephanie Lewis testified that when the officers arrived, A.J. was outside, walking near the Lewis residence. Trimble testified, however, that when they arrived, A.J. was inside the Lewis house and later walked out shirtless. (DE 66 at 20-21). It is undisputed that another approximately 20 year old non-resident male was present at the residence. (DE 66 at 20-21).

Jennifer Lewis suggested that officers should also check on another student, Andrea, who was also skipping school. (DE 62 at 7). After ending the conversation and taking A.J. to school, Trimble went to Andrea's home and spoke to her mother, who told him that she knew Andrea had

2

been down at the Lewis residence but it was her assumption that her daughter had gone to school. (DE 66 at 24-25).

Trimble then returned to the Lewis residence where Stephanie Lewis greeted him and told him that Jennifer Lewis had gone to pick Andrea up at the mall. Stephanie Lewis told Timble that Andrea had spent the night at the Lewis home the night before as the guest of one of her foster children. (DE 60 at 72). She further stated that Andrea was sick that morning and had obtained her mother's permission to remain at the Lewis residence. (*Id.* at 74-75). Stephanie said that later, after Andrea told her that she had her mother's permission to go to the mall, the Lewises dropped Andrea and their 17 year old foster son off at mall in another county. (DE 66 at 26-27 and 76-78). Later, Andrea's mother, who had not given her daughter permission to go to the mall, called Stephanie Lewis looking for her daughter. (*Id.* at 77). While Trimble was at the Lewis home, Jennifer arrived home with her foster son after having dropped Andrea off at home. Shortly thereafter, Trimble left.

Officers Tackett and Clark then joined Trimble at Andrea's home, where they spoke with both Andrea and her mother. Tackett described Andrea's mother as "hysterical," adamantly stating that she never gave her daughter permission to go to the mall and that she was supposed to be in school. (DE 62 at 13). Andrea told Tackett that the Lewises had a lot of people coming and going, including an "18 or 19 year old" male that was not one of the Lewises' foster children. Andrea also told Tackett that there had been marijuana use inside the Lewis home. (*Id.* at 21). Officer Tackett reported Andrea's mother to social services for failure to supervise her child in allowing Andrea to stay down at the Lewis residence and also for allowing Andrea to miss school "a lot." (*Id.* at 14). Trimble also filed a report with the Cabinet for Families and Children, which included information about the Lewises' role in the day's events. He said that it was out of concern for the

3

welfare of the children involved, and that he had a duty to report it. (DE 66 at 28-29). Trimble told

Tackett and Clark that he intended to make the report. (*Id.* at 30).

### B.    Light's meetings with H.S. and the Lewises

On the afternoon of September 4, Trimble contacted the school counselor Michelle Light

and asked her to check in on the safety of H.S., Stephanie Lewis's biological son and a second

grader at the school. (DE 65 at 10). Trimble advised Light that there was an ongoing truancy matter

involving older students who may have been staying at H.S.'s home.  He also advised Light that

social services had been contacted. (*Id.*).

Light called H.S. to her office.  There is disputed testimony as to who was present at the

meeting and what was said. Stephanie Lewis testified that H.S. came home upset because Light

questioned him about his mother's lifestyle, specifically, "if we lived together, if we slept together,

if we slept in the same bed, if we – if Jennifer helped with the children, physically and financially,

and who all lives in the home." (DE 60 at 81). Stephanie Lewis further stated that her son said he

was questioned about his "two mommies." (*Id.* at 87).

Light disputes this version of events and describes her line of questioning as such:

> I remember asking him who lived in the home. I asked him where he slept in the home,
> who was in there. I asked if teenagers ever came over, friends ever came over to the house.
> And I asked if he maybe ever saw anything inappropriate that was there. And he kind of
> looked at me. I said, "Maybe something that they shouldn't be doing." And then I recall
> asking, too, if there was always an adult present when teenagers were over visiting.

(DE 65 at 13-14). Light testified that she never asked H.S. about Stephanie and Jennifer's sleeping

arrangements. (*Id.* at 15). Light also said that she did not know that Stephanie and Jennifer were

in a same-sex relationship until this meeting with H.S. (*Id.*). According to Light, her line of

questioning concerned the other teenagers—where they slept and how often they stayed at the

Lewis home.

According to Light, she does not recall Officer Clark speaking to H.S. during this meeting. (*Id.* at 17). Clark stated that he does not recall being present in the room during Light's questioning of H.S.—only after the interview was over. Clark stated that, to his best recollection, he was there to talk to Light about an unrelated incident. (DE 64 at 26-27). Light and Clark had a brief discussion once H.S. had left to return to class, and both stated that Light voiced no concerns about H.S.'s living situation. (*Id.* at 18-19; DE 64 at 24). Light testified that she "did not have any concern for [H.S.]'s safety at that point." (DE 65 at 19).

Afterr H.S. had returned home from school, Stephanie Lewis called Light and told her they wanted to meet with her. (DE 61 at 59). The two set up a meeting for the following day, September 5. (*Id.*).

The September 5 morning meeting involved Stephanie Lewis, Jennifer Lewis, H.S., and Light. The Lewises expressed their concern about Light's questioning of H.S. the day before. According to Stephanie, Light denied saying "certain things" and "called H.S. a liar to his face." (DE 60 at 89-90). Specifically, Light denied asking H.S. about his two mothers sleeping together. (*Id.*). Light testified that H.S. confronted her and insisted she had asked him about his two mommies sleeping together. (DE 65 at 24-25). Again, Light denies this line of questioning.

### C.   Officers Tackett and Castle's interviews with the Lewises

On the morning of September 5, someone at the Russell Primary School called Tackett and informed him that the Lewises were at the primary school. (DE 62 at 25). Tackett was nearby and headed to Russell Primary School intending to conduct interviews of Stephanie and Jennifer Lewis. He also called Officer Castle to assist him as a witness for the interviews, as this was normal procedure "when we Mirandize and interview anybody." (*Id.* at 26). When Tackett arrived, the Lewises and Light were concluding their meeting.

According to all involved, the Lewises were interviewed separately from each other and both interviews were brief. Both Stephanie and Jennifer were mirandized prior to the interviews, and Officer Tackett testified that they were not under arrest and were free to leave at any point. (*Id.* at 47; DE 60 at 91). Stephanie testified that she waived her rights to counsel and silence and agreed to sit for the interview. (DE 60 at 91). Jennifer testified to the same, although she stated that she only waived her right to have an attorney present out of "fear." (DE 61 at 67). Jennifer Lewis did not assert that Tackett or Castle ever threatened her or intimidated her in any way.

Tackett, Castle, and the Lewises all confirm that the scope of the interviews mostly involved the truant kids—if they had stayed the night, the events of September 4, etc. (*Id.* at 68; DE 60 at 91-92). By both Stephanie and Jennifer Lewis's accounts, Officer Tackett never made any sort of disparaging comments nor did he discuss the topic of their relationship. (DE 60 at 93; DE 61 at 69-70). Castle did not participate in the questioning—he simply sat in the room as a witness. (DE 61 at 72-73; DE 63 at 11-12). The only disputed fact as to these interviews is whether the Lewises requested and were denied the opportunity to record them. Both Stephanie and Jennifer said they asked to record their interview and were told it was against the law. (DE 60 at 92; DE 61 at 69). Both Tackett and Castle testified that the Lewises never asked to record the interviews and thus Tackett never said no. (DE 62 at 49-50; DE 63 at 13).

### D. The subsequent criminal charges and CPS investigation

Following the interviews at the school, Tackett contacted the county attorney's office and relayed the facts at hand. (DE 62 at 15). The next morning, Tackett obtained an arrest warrant for both Stephanie and Jennifer Lewis. In the complaints, Tackett stated that each defendant "unlawfully committed the offense of unlawful transaction with a minor . . . by knowingly induc[ing], assist[ing], or caus[ing] a minor to become a habitual truant by allowing a 13 year old

6

girl and a 16 year old boy to stay at their house and allowing them to miss school." (DE 60, Ex. 3). Further, the complaint said defendant "during school hours without the parent's consent, took said 13 year old girl to the mall with an 18 year old boy and dropped them off." (*Id.*). The police served the arrest warrant the next day, September 6. (DE 60 at 229-30). Both Lewises were released on September 9. (*Id.* at 225). The criminal charges—unlawful transaction with a minor in the third degree in violation of KRS 530.070—are still pending.

Officer Clark reported the events to Child Protective Services (CPS) and to foster care services known as NECCO. He told NECCO that one of its foster parents was under investigation by the Flatwoods Police Department for driving a juvenile across county lines. (DE 64 at 38-39). Clark indicated that he routinely reported child safety issues to CPS involving parents in all types of relationships. (*Id.* at 46). Clark stated that it was standard procedure in cases of truancy or "anything involving a juvenile" to make this sort of "intake" call. He stated that he contacted NECCO because there were foster children involved. Clark was not involved in the NECCO investigation following his initial report. Following that investigation, NECCO removed the foster children from the Lewis home and removed the Lewises from the fostering program. (DE 60, Ex. 4).

Child Protective Services conducted its own investigation and issued a finding of substantiated neglect on December 12, 2019. It stated that

> Jennifer Lewis and Stephanie Lewis violated KRS 600.020 . . . when they allowed multiple neighborhood children to come in and out of their home, staying all night in the home, in the bedrooms with the children without appropriate adult supervision and not sending children to school that they were in the adult caregiving roles. [They admittedly] allowed [A.J. and Andrea] to stay all night at their home, without the children's parents' permission, and did not make the children go to school the following morning . . . . [They] admitted they drove Andrea, age 13, to the mall . . . instead of school, without her mother's permission, and dropped her off with the 18 year old recommitted foster child in their home . . . . [They] put themselves in the caregiving role of [A.J. and Andrea] when they allowed

them to stay the night in their homes and did not send them to school the following day while they remained in their care.

(DE 60, Ex. 2). The CPS investigation further concluded that the activities stated above put H.S., the foster children, and the other children involved "at risk of harm." (*Id.*). Further, the report stated that the Lewises would "bring in children and a 19-year-old man – that they had just met, allow them to come in and out of the home without appropriate supervision and allow them to have unlimited access to the foster children by staying all night and sleeping in the same room as the foster children." Though the foster children were removed from the Lewis home, Stephanie Lewis's biological son H.S. was never removed.

## II.   Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must "determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993).

A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001). If the evidence presented in opposition to summary judgment is merely colorable, or is not significantly probative, then summary judgment is proper. *Anderson*, 477 U.S. at 249–50. However, at this stage, it is not the Court's job to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial. *McGuire v. Michigan Dep't of Cmty. Health*, 526 F. App'x 494, 497 (6th Cir. 2013). "If conflicting testimony appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citations removed). Still, plausible allegations are not enough to defeat a properly supported summary judgment motion. The nonmoving party must set forth *sufficient specific* evidence to permit a fair-minded jury to return a verdict in its favor." *Mount v. United States Postal Serv.*, 79 F.3d 531, 533 (6th Cir. 1996).

## III.    Official Capacity Claims

Section 1983 claims against persons in their official capacities are the equivalent of claims against the governmental agency themselves. *Lambert v. Hartman*, 517 F.3d 433, 439-40 (6th Cir. 2008); *Savage v. Carter Cnty. Bd. of Educ.*, No. CIV.A. 07-118-ART, 2009 WL 1884137, at *7 (E.D. Ky. June 30, 2009). The plaintiffs have not named any governmental entities in their suit. Accordingly, the plaintiffs cannot sustain their official capacity claims. *See Philp v. Elola*, No. 3:15-CV-00913, 2016 WL 7733053, at *13 (M.D. Tenn. Dec. 16, 2016), report and recommendation adopted, No. 3:15-00913, 2017 WL 106672 (M.D. Tenn. Jan. 11, 2017).[1]

## IV.    Claims against the defendants in their individual capacities

Defendants argue for summary judgment on the merits as well as for qualified immunity. For the following reasons, the Court finds that qualified immunity is appropriate on all claims.

---

[1] Even if the plaintiffs would have sued a governmental entity, to prevail, they must show that "an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978)). Absent an official policy, the plaintiffs must show the defendants followed a custom "so permanent and well settled as to constitute a custom or usage with the force of law" in violating their constitutional rights. *Id.* The plaintiffs have provided no evidence of this.

A.   **Count I: Unreasonable search & seizure of H.S. against Tackett, Clark, and Light**

The Court will first address the issue of qualified immunity. The purpose of qualified immunity is to "give government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (cleaned up).

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) (quoting *Morrison v. Bd. Of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009)). Because the Court can address these two prongs in any order, the Court need not determine whether the alleged conduct was in fact unconstitutional if the plaintiff's right was not clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 236-43 (2009).

For a right to be "clearly established," the right's contours had to have been "sufficiently definite" at the time "that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). The paramount question in evaluating the clearly established prong is whether officials had fair warning that their conduct was unconstitutional. *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). The plaintiff bears the burden of showing that a government official is not entitled to qualified immunity. *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019).

***As to the school counselor Light***, the Sixth Circuit has clearly articulated that qualified immunity is proper in this scenario. In *Schulkers v. Kammer*, that Court held qualified immunity was proper for a social worker who conducted a warrantless interview of a minor in a school

setting. 955 F.3d 520, 533 (6th Cir. 2020). It held that, at the time of the interview in question, there was no clearly established right for minor students to be free from warrantless, in-school interviews by social workers investigating allegations of child abuse, neglect, or endangerment. *Id.* (citing *Barber v. Miller*, 809 F.3d 840 (6th Cir. 2015)). At that point, the Court had considered the issue of clearly established rights as to a social worker's *in-home* interviews of minor plaintiffs (*see Kovacic v. Cuyahoga County Department of Children & Family Services*, 724 F.3d 687 (6th Cir. 2013); *Andrews v. Hickman County*, 700 F.3d 845 (6th Cir. 2012)), But it distinguished those cases from cases like the one here involving *in-school* interviews.

The Sixth Circuit explained that "[in *Kovacic* and *Andrews*], both decisions turned on the greater constitutional concerns surrounding government intrusion into a citizen's home [thus] they offer [the plaintiff] little support in arguing that the in-school interviews violated [his] clearly established Fourth Amendment rights." *Barber*, 809 F.3d at 845–47. By contrast, in the context of in-school interviews, "the plaintiff-child fell short of demonstrating that [his] Fourth Amendment rights . . . were clearly established in our circuit at the time of the interviews." *Schulkers*, 955 F.3d at 535.

In *Schulkers*, however, the Sixth Circuit went beyond its qualified immunity analysis and discussed the constitutionality of the underlying events. It held that the Fourth Amendment does in fact govern a social worker's in-school interview of a child pursuant to a child abuse investigation and, at a minimum, a social worker must have reasonable suspicion of child abuse before conducting an in-school interview without a warrant or consent. *Id.* at 538. Thus, there now seems to be enough definitiveness in the contours of the right to affect the "clearly established" prong of qualified immunity analyses after *Schulkers*.

But the events at issue here took place in 2019 – before *Schulkers* was decided..  For the plaintiffs to rebut a defendant's claim of qualified immunity, they must show their rights were clearly established *at the time of the alleged conduct*. Like the similar in-school interviews in *Schulkers*, the in-school interview here was performed when there were no clearly established Fourth Amendment rights surrounding a counselor's in-school interview of a minor.

In short, a reasonable counselor in Light's position would not have known that H.S. had a Fourth Amendment right to be free from the in-school interview that occurred. Accordingly, Light is entitled to qualified immunity on this claim.

**As to Tackett**, there is  no evidence that he was present at Light's interview with H.S. Nor is there any evidence to suggest that Light initiated the interview at his behest. Light testified that Trimble contacted her and asked her to check up on H.S. (DE 65 at 10). Tackett testified that he was not involved in the interview in any way, and only knew about it because Officer Clark had mentioned it. (DE 62 at 17-18). There is no evidence  that Tackett knowingly violated any clearly established right with regarding the in-school interview.  Accordingly, this claim against Tackett must fail as a matter of law.

**As to Clark**, there is no evidence or allegation that he was present for the interview with H.S. The plaintiffs attempt to link Clark to the alleged Fourth Amendment violation through a recording which they claim proves Light interviewed H.S. at Clark's behest. But this recording does nothing to alter the qualified immunity analysis for a few reasons.

First, the evidence itself is of questionable probative value. Evidence submitted in opposition to a motion for summary judgment must be admissible. *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). Further, it must be sufficiently probative as to assist the Court in determining whether a dispute of material fact actually exists. Though the audio tape may satisfy

the bare authentication requirements of FRE 901(a) and FRE 901(b)(1), proper authentication is not the only requirement for admissibility. To be admissible, recordings must be authentic, accurate and trustworthy, as well as audible and sufficiently comprehensible for the jury to consider the contents. *United States v. Miller*, 562 F. App'x 272, 290 (6th Cir. 2014) (cleaned up). A recording is "inadmissible if the 'unintelligible portions are so substantial as to render the recording as a whole untrustworthy.'" *Id.* (quoting *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983)). Though one can mostly make out what is being said on the recording, it is unclear who is speaking at any given time. Further, the recording is incomplete and suffers from a lack of context. It is only 25 seconds long and contains only a few statements from a significantly longer conversation. It is arguably so woefully incomplete and devoid of context as to render it untrustworthy.

Despite any evidentiary concerns, the contents of the recording do not support the plaintiffs' assertions. The Lewises assert that "the tape recording clearly sets forth that Clark was present and that [Light] had conducted her interview [of H.S.] based upon the information provided by Clark, before the interrogation." (DE 72 at 37). Further, the Lewises claim that, from the recording, "it is certainly reasonable to infer that Clark had requested the Counselor to interview H.S." (*Id.*).

But nothing in the 25-second recording would allow any reasonable juror to make such inferences. Transcribed to the best of the Court's ability, the snippet of conversation provides as follows:

> **Party presumed to be Michelle Light**: I know that you guys have some things going on but I did not ask that, I just wanted to make sure that he was ok. I didn't ask anything specific . . .

> **Party presumed to be Stephanie or Jennifer Lewis**: But how are you aware that there's things going on if it happened after school [inaudible]?

13

**Light**: . . . this didn't happen after . . . it was going on before school let out and officer Clark came in here and me being the counselor we need to make sure . . .

**Lewis**: We need to do . . . we need to see if we can do something about him . . .

(DE 74, Recording). This brief portion of the conversation merely establishes that Clark did "come in there" at some point—but there is no dispute that Clark, at some point, spoke to Light about H.S. This recording does not, however, establish that Clark directed Light to interview H.S. This unreliable piece of evidence is simply not enough to defeat summary judgment.

Finally, even if the Court takes the facts in a light most favorable to the Lewises, the claims against Clark still fail as a matter of law. For the sake of argument, even if Clark relayed information to Light about the events at the Lewis residence on the morning of September 4, that would not strip Clark of qualified immunity. Plaintiffs cite no law that would support the idea of a well-defined constitutional right that Clark would have known he was violating at the time. As explained above, the law surrounding in-school, warrantless interviews with minors was murky at the time of the events underlying this matter. And there is no evidence that Clark actually participated in questioning H.S. in any way, or that he sat in on the interview. The evidence suggests that Clark arrived at Light's office as the discussion with H.S. was wrapping up.

It strains credulity to suggest that Clark "seized" H.S. for the purposes of the Fourth Amendment, even if the Court assumes that Clark discussed the situation with Light prior to the meeting (which the evidence does not support). It strains it even more to suggest that the law's contours were "sufficiently definite" at the time "that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 138 S. Ct. at 1153. Accordingly, Clark is entitled to qualified immunity on this claim.

14

**B.     Counts II & III: Unreasonable seizure of Parent Plaintiffs against Tackett and Castle**

Next, the plaintiffs allege that Officers Tackett and Castle performed an unconstitutional seizure of both Stephanie and Jennifer Lewis on September 5, when they questioned them separately at the school. The Court will first address the Officers' qualified immunity arguments.

Again, to defeat the Officers' claims of qualified immunity, the evidence viewed in the light most favorable to the plaintiffs must permit a reasonable juror to find that: (1) the Officers violated a constitutional right; and (2) the right was clearly established. For a right to be clearly established, it had to have been so clearly defined that any reasonable official in the defendant's shoes would have understood that he was violating it.

The Fourth Amendment protects against unreasonable searches and seizures. A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all  circumstances surrounding the incident, a reasonable person would have believed that they were not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). But there are no Fourth Amendment implications when law enforcement officers approach someone in public and engage them in conversation or ask them to answer a few questions. *Florida v. Bostick*, 501 U.S. 429 (1991). This is true even when the Officers ask a person to accompany them to another area or room, *see United States v. Collis*, 766 F.2d 219, 221 (6th Cir. 1985), especially when the location of the interview is not inherently intimidating. *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

On September 5, 2019, both Lewises consented to be interviewed at the school. A consensual interview does not constitute a seizure "absent coercive or intimidating behavior which negates the reasonable belief the compliance is not compelled." *Collis*, 766 F.2d at 221. Neither Stephanie nor Jennifer Lewis were told they were under arrest or that their freedom of movement was restrained. They were not handcuffed, nor is there any evidence that they were locked in a

15

room. The interviews were very brief – a matter of minutes. There was no show of physical force and, according to all involved, no verbal threats or even any disparaging remarks directed at the Lewises. Simply put, there is no evidence that a reasonable person in the Lewises' position would have felt they were unable to terminate the interview at any time. *See United States v. Gaddie*, No. CRIM.A.3:07CR111JHM, 2008 WL 1995081, at *2 (W.D. Ky. May 6, 2008) (collecting cases for the proposition that a person would feel free to leave absent hostility, lengthy questioning, or shows of force).

There are two primary disputes of fact regarding these interviews, neither of which are material to the question of qualified immunity. First, as is the case with all claims in this action, the plaintiffs allege that the officers' motivation was discriminatory. But both Stephanie and Jennifer Lewis stated that the officers made no disparaging remarks during these interviews, nor did they even discuss the topic of Stephanie and Jennifer's relationship. Further, as discussed above, the officers received consent for the interviews. Second, there is the question of whether the officers denied the plaintiffs' requests to record the interviews. Both Tackett and Castle stated that neither plaintiff ever asked to record their respective interview. But even if the Court accepts the Lewises' assertions as true, they cite no caselaw to suggest how this recording issue would affect qualified immunity as to a Fourth Amendment claim.

In sum, it is undisputed that Officer Tackett advised both Stephanie and Jennifer Lewis of their rights and both plaintiffs waived those rights and agreed to be interviewed. There is no evidence in the record of any intimidation or coercion. The validity of the consent goes to the question of whether a constitutional right was violated, and the officers' reasonable reliance on that consent goes to the question of whether they knew they were violating a clearly established right. Either way, the issue here is resolved through an analysis of the consent.

Stephanie and Jennifer Lewis also assert a claim of false imprisonment against Tackett and Castle for the at-school interviews discussed above. This is a derivative claim. *See Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1161 (6th Cir. 2021) ("The Fourth Amendment does not adopt separate bans on false arrests [and] false imprisonments. It establishes a singular ban on 'unreasonable' seizures.") (cleaned up). The foregoing analysis also covers the plaintiffs' claims of false imprisonment.[2] No reasonable juror could conclude that Officers Tackett and Castle knew they were violating any of the plaintiffs' clearly established rights under these facts. Accordingly, the Officers are entitled to qualified immunity on these claims.

### C. Count IV: Unconstitutional procurement of an arrest warrant against Tackett

Plaintiffs style their next claim as "discriminatory procurement of arrest warrant as selective enforcement violation of due process and equal protection." In this claim, Plaintiffs allege that Tackett secured the arrest warrant "through false, misleading, or incomplete investigation" and that the filing of charges was based on discrimination. Since the plaintiffs have not sued any officials involved in the filing and prosecution of the criminal charges, the only thing left is a Fourth Amendment claim against Tackett for making false statements to support an arrest warrant.

The Fourth Amendment requires that arrest warrants be issued only upon a showing of probable cause. *Greene v. Reeves*, 80 F.3d 1101, 1105 (6th Cir. 1996). In a civil rights case, an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989). Thus, an

---

[2] The Officers would be entitled to qualified immunity even if the Court construed this as a state law claim. In Kentucky, a claim of false imprisonment requires that the plaintiff (1) was in fact detained and (2) the detention was unlawful. *Crigger v. McIntosh*, 254 F. Supp. 3d 891, 900 (E.D. Ky. 2017) (quoting *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. Ct. App. 2001)). There is no evidence that any deprivation of liberty occurred here. Further, the Officers had a reasonable justification to question the Lewises. Their non-coerced consent obviates the existence of an unlawful restraint.

officer may be held liable under § 1983 for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest. *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999).

To overcome an officer's assertion of qualified immunity, however, a plaintiff must make "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). This allows officers to make mistakes without stripping them of qualified immunity. *Butler v. City of Detroit, Michigan*, 936 F.3d 410, 418 (6th Cir. 2019). This exacting standard is born out of the fact that police officers submitting sworn statements for warrants are nonlawyers "in the midst and haste of a criminal investigation." *Illinois v. Gates*, 462 U.S. 213, 235 (1983). The burden is on the plaintiff to "present *substantial* evidence to show a more culpable mental state." *Butler*, 936 F.3d at 418 (emphasis added).

But a plaintiff cannot show "deliberate falsehood" by "simply contradicting a warrant's affidavit." The officer's mental state is "critical to the qualified immunity question." The Lewises' assertions that the entire reason for Tackett's warrant submission was bias and discrimination is simply not enough to meet *Vakilian*'s demanding standard. Omitting some facts that may or may not have been favorable to the Lewises, or perhaps mischaracterizing "facilitating truancy" as "facilitating *habitual* truancy" is not enough to attach the requisite culpability to Tackett's actions. *See Scott v. Sanders*, 482 F. App'x 996, 997 (6th Cir. 2012) (affirming a grant of qualified immunity because there was "no evidence that [the officers] were anything worse than negligent").

Plaintiffs cannot show that the warrant, "stripped of the false claims, would fail to establish probable cause." *Butler*, 936 F.3d at 419. Even if the application did not state the Lewises were

facilitating "habitual" truancy and even if it included some of the facts that the plaintiffs claim were omitted (like that the juveniles in question were truant on other occasions, absent the Lewises' involvement, *see* DE 72 at 41), what remains is enough for probable cause. Tackett's factually undisputed assertions were that the plaintiffs assisted truancy by "allowing a 13 year old girl and a 16 year old boy to stay at their house and allowing them to miss school during school hours and without the parent's consent, took said 13 year old girl to the mall with an 18 year old boy and dropped them off." (DE 60, Ex. 3).

Accordingly, because the plaintiffs do not make a substantial showing that Tackett stated a deliberate falsehood or showed reckless disregard for the truth or that the allegedly false or omitted information was material to the finding of probable cause, Tackett is entitled to qualified immunity on this claim.

### D. Counts V, VI, & VII: Due process violations against all defendants

The Lewises allege that all defendants, acting in concert, violated their substantive and procedural due process rights to familial association, autonomy, privacy, and decision-making under the Fourteenth Amendment when they interviewed their minor child H.S. without their knowledge or consent. At the outset, based on the facts and conclusions stated above, the claims against Tackett and Castle must fail as a matter of law. There is no evidence that Tackett and Castle were directly or even indirectly involved with Light's interview of H.S.

Here, the plaintiffs are alleging substantive due process violations based on the brief interview of H.S. at the school. Most of the case law on this topic involves actual investigations into child abuse or neglect. The plaintiffs here base their due process claims on the questioning of H.S. on September 4. As that point, there was no investigation.  If anything, Light (and even Clark

19

if the Court accepts the plaintiffs' version of events) were merely trying to decide if investigation was warranted.

**First, as to substantive due process**, the Supreme Court has "repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006). But "the right to family integrity . . . is neither absolute nor unqualified." *Id.* at 690. "The right to familial association is not implicated merely by governmental investigation into allegations of child abuse." *Id.* Absent evidence of bad faith, improper motive, or investigation tactics that shock the conscience, "such investigations will not infringe on a family's fundamental rights." *Teets v. Cuyahoga Cnty., Ohio*, 460 F. App'x 498, 502 (6th Cir. 2012).

The Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense. *Chambers v. Sanders*, 63 F.4th 1092, 1097 (6th Cir. 2023) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)) (cleaned up). Thus, not every act that results in an interference with the rights of familial association is actionable. Only conduct intended to injure—"state action [that] was specifically intended to interfere with the family relationship"—gives rise to substantive due process concerns. *Id.* (citing *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018); *McCurdy v. Dodd*, 352 F.3d 820, 827-28 (3d Cir. 2003)).

Thus, for the plaintiffs to overcome the defendants' assertions of qualified immunity they must show that the facts, viewed favorably, would permit a reasonable juror to conclude the defendants violated a clearly established constitutional right through actions that were intended to interfere with the familial unit. The Lewises simply fail to assert facts, even viewed favorably, that would strip the defendants of qualified immunity.

First, and most importantly, is the fact that this was a brief interview and not a long detention or a child separation. Like the plaintiffs' Fourth Amendment claims, there is simply no established Fourteenth Amendment precedent in this Circuit that would put the defendants on notice that a brief in-school interview was plainly unconstitutional. The plaintiffs' claim here fails to surmount the "clearly established" bar of the qualified immunity analysis. *See Schattilly v. Daugharty*, No. 14-CV-11905, 2015 WL 1412502, at *7 (E.D. Mich. Mar. 20, 2015) (granting qualified immunity for official who interviewed a child at school without parental consent because no Circuit—the Sixth or otherwise—had clearly established that such an interview violates the parent's Fourteenth Amendment rights of familial association); *see also Bukowski v. City of Akron*, 326 F.3d 702, 712 n.2 (6th Cir. 2003) (noting that most courts have allowed parents to recover for substantive due process claims under § 1983 only where the plaintiffs have alleged a "permanent, physical loss of association of an immediate family member as a result of unlawful state action").

The allegations of discriminatory motive in this case are merely conclusory. Plaintiffs allege only that H.S. was questioned about his "two mommies" and asked about sleeping arrangements at the Lewis residence, which included teenagers.   Here, accepting the Plaintiff's version of the facts as true, the phrase "two mommies," does not provide sufficient evidence of discriminatory intent to overcome immunity. The phrase "two mommies" is not inherently discriminatory. Stephanie and Jennifer Lewis are, in fact, H.S.'s two mommies.

Perhaps this evidence of bad faith or discriminatory intent could rise above merely colorable if there was not a legitimate basis for officials to be concerned. But this interview did not occur in a vacuum. It happened after officials found multiple truant minors at the Lewises' home, including a girl whom the Lewises transported across county lines to the mall with an older male on a school day—unbeknownst to her mother. Police were told that there were kids coming

and going and it was apparent that multiple children who did not live there were sleeping over. Moreover, there is no significantly probative evidence that the interview of H.S. was done in bad faith. And no one could argue that the officials' behavior, given the circumstances, shocks the conscience.

*As to procedural due process*, though they couch it as two separate "deprivations"—family associational rights and liberty interest in parental exercise—the Lewises' primary argument is that the defendants improperly interfered with parental control and failed to afford any procedure by which they could have challenged H.S.'s questioning.

When "discussing the constitutionally protected right to familial association, courts focus on the parental right of custody and control over their children." *Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006). A parent's liberty interest in familial association is certainly implicated where a child is removed from his or her parent's care and custody, so a state actor must provide sufficient due process in that scenario. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). However, as is the case with a claim under substantive due process, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." Moreover, as discussed above, it is unclear how the facts of this case implicate a Fourteenth Amendment right, much less a clearly established one. *See Schattilly*, 2015 WL 1412502, at *7. In other words, Stephanie and Jennifer Lewis's procedural due process claims fail because there was no protected right to procedure with which the defendants interfered.

Accordingly, all defendants are entitled to qualified immunity on the plaintiffs' due process claims.

### E.  Count XIII: Equal protection violations against all defendants

The Lewises' equal protection claim is really the crux of their entire action. They assert that discrimination permeated the defendants' actions. In this count, the Lewises allege that the "investigations and subsequent actions were conducted solely on the basis of two women being legally married" and further argue that this constitutes "selective enforcement of the law and a prejudicial predisposition towards the plaintiffs." (DE 72 at 43). Thus, what they state here is a claim for selective enforcement. Whereas the previous claims forced the Court to look at qualified immunity through hyper-focused lenses, the standard for equal protection claims allows the Court more latitude to consider broad motivations and investigatory decisions throughout the roughly two days that the defendants were involved in the Lewises' case. *See Stemler v. City of Florence*, 126 F.3d 856, 872–73 (6th Cir. 1997) ("the possibility of a discriminatory motive does not affect the inquiry into the objective reasonableness . . . for the purposes of the Fourth Amendment, [however there exists] the long-established availability of a separate selective enforcement claim under the Equal Protection Clause"). When considered, the Court still finds that qualified immunity is proper as to all defendants.

First, the Lewises  had a clearly established right to be free of discrimination. "It is not necessary to have a case directly on point for a right to be clearly established. It is sufficient that existing precedent place the question beyond debate" *Nelms v. Wellington Way Apartments*, LLC, 513 Fed.Appx. 541, 547 (6th Cir. 2013) (cleaned up). The law has been clearly established for decades that "homosexuals do constitute an identifiable group for equal protection purposes." *Davis v. Prison Health Servs.*, 679 F.3d at 441–42 (6th Cir. 2012) (citing *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997). Therefore, at this point in time, it would have been clear to any reasonable officials in the defendants' positions that the Constitution protects

23

same-sex couples from invidious discrimination based on their sexual orientation. *See Love v. Beshear*, 989 F. Supp. 2d 536, 547 (W.D. Ky. 2014); *see also Yerkes v. Ohio State Highway Patrol*, 455 F. Supp. 3d 523, 542 (S.D. Ohio 2020).

So, the question becomes whether a reasonable juror could find that the defendants did in fact violate the Lewises' constitutional rights. "Sometimes, the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement." *Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir. 1996). In the § 1983 context, this means purposeful discrimination intended to accomplish some "forbidden aim"—selective enforcement due to some arbitrary classification. *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000).

To state a claim of selective enforcement, the plaintiffs must demonstrate three elements: (1) the state actor must single out a person belonging to an identifiable group even though he has decided not to prosecute persons not belonging to that group in similar situations; (2) they must initiate the prosecution with a discriminatory purpose; (3) the prosecution must have a discriminatory effect on the group to which the defendant belongs. *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 700 (6th Cir. 2020).

With regard to the first element, "it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside her category were not prosecuted." *Stemler*, 126 F.3d at 873. There is a strong presumption that state actors have properly discharged their duties. "To overcome that presumption the plaintiff must present clear evidence to the contrary; *the standard is a demanding one*." *Id.* (emphasis added).

Though there is no doubt that the Lewises belong to an identifiable group for the purposes of this equal protection analysis, their claim fails at the outset. Stephanie and Jennifer Lewis have

24

not shown that any similarly situated persons were treated differently. It is not enough that other parents involved in the incident were not questioned, investigated, and eventually charged with a crime. For the equal protection claim to even get off the ground, there must be clear evidence that state actors did not treat *similarly situated* persons the same as the Lewises. At the time the defendants were looking into the situation in September of 2019, there were no other people who were similarly situated to the Lewises.

"Similarly situated" means what it sounds like. It is not enough for a plaintiff to allege that state officials targeted them and failed to target other people involved in the same general incident or practice. The plaintiffs must be able to point to non-targeted persons whose conduct and circumstances were truly aligned with theirs at the time of the alleged disparate treatment. *Compare Boone v. Spurgess*, 385 F.3d 923, 933 (6th Cir. 2004) (two combatants in a fistfight not similarly situated as to support equal protection claim when officers chose to seize one before the other), *Lofties v. Elizabeth Grabel SP567*, 826 F. App'x 539, 542 (6th Cir. 2020) (two motorists not similarly situated when one drove vehicle completely on shoulder and the other turned his truck only partially into the shoulder), *Gardenhire*, 205 F.3d at 320 (two business owners who both claimed theft by the other not similarly situated because one owner was already implicated in a crime and the other was not), *Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 522 (6th Cir. 2008) (black man not similarly situated to white girlfriend, both on scene of disorderly conduct call, because he was yelling and cursing and she was not) *with Stemler*, 126 F.3d at 873 (arrested lesbian plaintiff did sufficiently show she was similarly situated to non-arrested party when they were both drunk and under suspicion of DUI and by all accounts the non-arrested party was "far drunker").

Here, the Lewises provide no evidence that they received different treatment than similarly situated individuals. No other parents involved were foster parents. No other parents were allowing children that were not theirs to sleep over and fail to attend school. No other parents drove a minor girl to the mall on a school day without her mother's express permission. There are no facts, even construed in a light most favorable to the plaintiffs, that would persuade a reasonable juror that any defendant here violated their right to equal protection under the Fourteenth Amendment. The plaintiffs cannot make a prima facie showing of selective investigation or enforcement. Accordingly, the defendants are all entitled to qualified immunity on this claim.

**V.     Conclusion**

Based on the foregoing reasons, the Court finds that all defendants are entitled to immunity on all claims. Accordingly, the Court hereby ORDERS that the defendants' motions for summary judgment (DE   67 & DE 68) are both GRANTED. The Court will issue a corresponding judgment forthwith.

This 4th day of October, 2023.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY